UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | |
|---|---|
| CINCINNATI INSURANCE COMPANY, | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| AMY GRAY, as personal representative of | ) |
| the Estate of Clinton Gray; ALL-ONE INC.; | ) |
| and CAPITAL CONSTRUCTION | ) |
| SERVICES, INC., | ) |
| | ) |
| Defendants, | ) |
| | ) |
| _____ | ) |
| CAPITAL CONSTRUCTION SERVICES, | ) |
| INC., | ) |
| | ) |
| Counterclaimant and | ) |
| Crossclaimant, | ) |
| | ) |
| vs. | ) |
| | ) |
| CINCINNATI INSURANCE COMPANY; | ) |
| AMY GRAY, as personal representative of | ) |
| the Estate of Clinton Gray; and ALL-ONE, | ) |
| INC., | ) |
| | ) |
| Counterclaim and Crossclaim | ) |
| Defendants. | ) |
| | ) |

1:08-CV-1694-TWP-TAB

**ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

On May 21, 2007, Clinton Gray suffered a fatal on-the-job injury while working on the

renovation of a Kroger grocery store in Indianapolis.  Gray was working as an employee of All-One,

Inc. ("All-One"), an electrical subcontractor of the general contractor on the job, Capital

Construction Services, Inc. ("Capital").  Gray's estate brought a lawsuit against Capital in state court, claiming that Capital owed Gray a  nondelegable duty to provide a safe workplace and that it negligently breached that duty, causing his death.  The estate received a summary judgment in its favor on the issue of Capital's assumption of such a nondelegable duty.  In response to the complaint against it, Capital asserted a third-party claim against All-One in that same litigation, claiming that All-One breached its contract with Capital to provide it with insurance and indemnify it against claims arising out of All-One's work on the Kroger renovation project.

This lawsuit was filed by All-One's insurer, Cincinnati Insurance Company ("CIC"), which seeks a determination that it does not insure Capital and that All-One, who is an insured under three separate CIC polices, is not entitled to a defense or indemnity with respect to Capital's third-party claim in the state litigation.  Capital has counterclaimed and cross-claimed, asserting its entitlement to coverage under two of the policies or All-One's entitlement to indemnification against Capital's third-party claim under the other policy.  CIC and Capital have filed cross-motions for summary judgment.

For the reasons set forth below, CIC's Motion For Summary Judgment [Dkt. 58] is GRANTED.  Capital's Motion For Partial Summary Judgment [Dkt. 60] is DENIED.

### *Summary Judgment Standard*

Lawsuits over the construction of an insurance contract are often amenable to summary judgment because, under Indiana law, interpreting the policy is a question of law for the court.  *See Schenkel & Schultz, Inc. v. Homestead Ins.* Co., 119 F.3d 548, 550 (7th Cir. 1997).  In addressing

cross-motions for summary judgment, the Court may grant summary judgment (in whole or in part) or deny (in whole or in part) either or both parties' motions. *Davidson v. Citizens Gas & Coke Utility,* 470 F.Supp.2d 934, 939 (S.D. Ind. 2007). Cross motions for summary judgment in declaratory judgment actions are not subject to a unique standard. If there is no genuine issue as to any material fact, summary judgment is available to either party if it is determined that one or the other is entitled to it as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986).

To determine whether any genuine factual issue exists, the Court examines the pleadings and the proof as presented in depositions, answers to interrogatories, admissions, and affidavits made a part of the record. *First Bank & Trust v. Firstar Information Services, Corp.*, 276 F.3d 317, 321 (7th Cir. 2001). The Court draws all reasonable inferences from undisputed facts in favor of the non-moving party and views the disputed evidence in the light most favorable to the non-moving party. *Id.* at 322. However, the non-moving party may not rest upon mere allegations in the pleadings or upon conclusory testimony or affidavits; rather, he must go beyond the pleadings to support his contentions with properly admissible evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Metaphysical doubt as to a material fact will not prevent summary judgment; only if the non-moving party properly submits evidence that would be sufficient to sustain a verdict in its favor can it be said to have survived this "put up or shut up" moment in the lawsuit. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986); *Everroad v. Scott Truck Systems, Inc.,* 604 F.3d 471, 476 (7th Cir. 2010).

### *Factual Background*

In February 2007, Capital was awarded a contract to serve as the general contractor for the renovation of a Kroger grocery store in Indianapolis.  Capital accepted All-One's bid to perform the electrical work on the project.  On March 15, 2007, Mark Bertalon, Capital's project manager, sent an e-mail to All-One's project manager, Jeff Britton, indicating that All-One should proceed with the work and that Bertalon would be "getting out contracts soon."  Clinton Gray died on May 21, 2007, when he fell while working on the Kroger project as an employee of All-One.  There was no signed contract between Capital and All-One at the time of this tragedy.

Capital relies on the deposition testimony of Brett Williams, its Vice President, to explain why no signed contract was in place between Capital and All-One, and also to describe what occurred after the parties became aware that no signed contract was in place.  Williams testified at a deposition as Capital's Fed.R.Civ.P. 30(b)(6) designee.  At that deposition, Williams claimed that he was told by an office employee on the day following the deadly accident that there was no signed contract in place with All-One.  When he asked why, he was told by the employee that she had given a contract to Mark Bertalon at the start of the project to give to All-One for execution, but "that was the last she knew of the contract."  Williams also affirmed that the contract for All-One's work would have been the same standard AIA 401 form contract, which Capital used for each of its subcontractors.

The AIA form contract at issue contains provisions requiring the subcontractor to indemnify the general contractor against any damages occasioned by the negligence of the subcontractor or its employees.  It also has provisions requiring the subcontractor to maintain certain types of insurance

4

coverage and to provide acceptable certificates of insurance to the general contractor prior to the start of the work.  It is undisputed that Capital did not receive a signed contract or an insurance certificate from All-One prior to Gray's death.

Jeff Britton, All-One's project manager, testified at his deposition that he never received a written contract from Capital until May 23, 2007, two days after Gray's death.  The day before he received and signed the AIA form contract, Britton received an email from Bertalon, stating:

> Jeff - Please see this e-mail as you (sic) notice to proceed with the work required to complete the Kroger's renovation per your proposal dated 3/20/07 - A formal contract in the amount of $149,800.00 is forth coming - Please proceed with sending Capital a copy of your certificate of insurance as requested earlier today (see faxed copy) Your prompt attention to this matter is greatly appreciated.   Mark Bertalon Project Manager

Britton executed the form contract on behalf of All-One, dated May 23, 2007, near the top of the first page, and then returned a copy of the contract to Capital.  Williams signed the same contract on behalf of Capital.

Britton testified at his deposition that during the exchange of information with insurance companies following the accident, he received a letter from Capital's insurance company referring to a subcontract dated April 1, 2007.  After the estate of Clinton Gray filed suit in state court against Capital, Britton received a copy of the third-party complaint that Capital had filed against All-One in that same litigation.  A copy of the contract was attached to that third-party complaint with the first page dated April 1, 2007.  Because he knew there was never a contract signed prior to May 23, 2007, Britton immediately sought out his insurance agent for clarification.

Eventually, All-One made a claim to its insurer, CIC, with respect to Capital's third-party

5

complaint.  CIC responded by filing this declaratory judgment action, asserting that it has no duty to defend or indemnify All-One against Capital's claims and that Capital is not an insured under its policies.  Capital has filed a counterclaim against CIC and a cross-claim against Gray's estate and All-One, alleging in each that it was an insured entitled to coverage under the CIC policies and that CIC had a duty to defend and indemnify All-One against its third-party complaint.

The first page of the contract that was attached to Capital's third-party complaint is dated April 1, 2007.  However, the page contains an additional computer generated date at the bottom of the page.  In very small print, as part of the AIA form attribution, there is a statement that the document was produced by the AIA licensed software at 11:33 a.m. on May 24, 2007.  At the bottom of the remaining pages of the thirteen page document, the same attribution bears a time and date of 2:59 p.m. on May 23, 2007.  In his deposition, Brett Williams does not deny that the first page of the signed contract should have born the same May 23, 2007 date and time stamp.  In doing so, Williams admits that the correct first page was somehow removed, and the page printed on May 24, 2007 with the April 1, 2007, date near the top was somehow substituted in its place.  Capital asserts that this was simply a mistake that occurred when the document was assembled.  It claims that the file contained loose copies of the contracts printed at its office on both May 23rd and May 24th, and that the contract printed on May 24th was dated April 1, 2007 to reflect the actual date the contract was first printed.  CIC infers a more nefarious intent.

### *The Insurance Policies*

At all relevant times, All-One was insured under three separate polices issued by CIC:  (1) a Commercial General Liability policy ("CGL") - $1,000,000 per occurrence; (2) a Commercial Umbrella policy - $2,000,000 per occurrence; and (3) a Worker's Compensation policy - $500,000 per accident.  Capital was not a named insured under any of the policies.

**I. Commercial General Liability Policy**.

The CGL Policy contains the following provisions relevant to the issues in this litigation:

*1. Insuring Agreement*

> *a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply...*

The CGL  Policy contains the following exclusions relevant to the issues in this litigation:

*This insurance does not apply to:*

  *...*

*b. Contractual Liability*

*"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement.  This exclusion does not apply to liability for damages:*

*(1)    That the insured would have in the absence of the contract or agreement; or*
*(2)     Assumed in a contract or agreement that is an "insured contract", provided that the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. . .*

7

*e. Employer's Liability*

*"Bodily injury" to:*

*(1)   An "employee" of the insured sustained in the "workplace";*
*(2)   An "employee" of the insured arising out of the performance of duties related to the conduct of the insured's business; or*
*(3)   The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraphs (1) or (2) above.*

*This exclusion applies:*

*(1)   Whether the insured may be liable as an employer or in any other capacity; and*
*(2)    To any obligation to share damages with or repay someone else who must pay damages because of the injury.*

*This exclusion does not apply to liability assumed by the insured under an "insured contract."*

The CGL Policy, in its "Contractors' Commercial General Liability Broadened Endorsement," contains the following provisions relevant to the issues in this litigation:

*9. Automatic Additional Insured – Specified Relationships*

*a.   The following is hereby added to SECTION II – WHO IS AN INSURED:*

*(1)   Any person or organization described in paragraph 9.a.(2) below (hereinafter referred to as additional insured) whom you are required to add as an additional insured under this Coverage Part by reason of:*

*(a)    A written contract or agreement; or*
*(b)    An oral agreement or contract where a certificate of insurance showing that person or organization as an additional insured has been issued, is an insured, provided:*

*(a)   The written or oral contract or agreement is:*

*1)    Currently in effect or becomes effective during the*

8

> *policy period; and*
>
> 2)    *Executed prior to an "occurrence" or offense to which this insurance would apply; and*

(b)    *They are not specifically named as an additional insured under any other provision of, or endorsement added to, this Coverage Part.*

The CGL Policy, in its Definitions section contains the following relevant provision:

*12. "Insured contract" means: ...*

f.    *That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury", "property damage" or "personal and advertising injury" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.*

## II. Commercial Umbrella Policy

The Commercial Umbrella Policy contains the following provisions relevant to the issues in this litigation:

A.   *Insuring Agreement*

1.    *We will pay on behalf of the insured the "ultimate net loss" which the insured is legally  obligated to pay as damages for "bodily injury", "personal and advertising injury" or "property damage" arising out of an "occurrence" to which this insurance applies...*

The Commercial Umbrella Policy contains the following Exclusions relevant to the issues in this litigation:

*This insurance does not apply to:      ...*

3.      *Contractual Liability*

> *Any liability for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for "bodily injury", "personal and advertising injury" or "property damage":*
>
> a.    *That the insured would have in the absence of the contract or agreement; or*
> b.    *Assumed in a contract or agreement that is an "insured contract", provided that the "bodily injury", "personal and advertising injury" or "property damage" occurs subsequent to the execution of the contract or agreement.*

...

9.      *Employer's Liability Limitation*

> *Any liability arising from any injury to:*
>
> a.    *An "employee" of the insured sustained in the "workplace";*
> b.    *An "employee" of the insured arising out of the performance of duties related to the conduct of the insured's business; or*
> c.    *The spouse, child, parent, brother or sister of that "employee" as a consequence of a. or b. above.*
>
> *This exclusion applies:*
>
> a.    *Whether the insured may be liable as an employer or in any other capacity; and*
> b.     *To any obligation to share damages with or repay someone else who must pay damages because of the injury...*

## III. Worker's Compensation Policy

Part One of the Worker's Compensation policy addresses All-One's liability to its own employees.  Part Two of that policy addresses All-One's liability to third-parties and it contains the following provisions and exclusion relevant to the issues in this litigation:

10

*A. How This Insurance Applies*

*This employers liability insurance applies to bodily injury by accident or bodily injury by disease. Bodily injury includes resulting death.*

1.  *The bodily injury must arise out of and in the course of the injured employee's employment by you.*
2.  *The employment must be necessary or incidental to your work in a state or territory listed in item 3.A of the Information Page.*
3.  *Bodily injury by accident must occur during the policy period.*
4.  *Bodily injury by disease must be caused or aggravated by the conditions of your employment.  The employee's last day of last exposure to the conditions causing or aggravating such bodily injury by disease must occur during the policy period.*
5.  *If you are sued, the original suit and any related legal actions for damages for bodily injury by accident or by disease must be brought in the United States of America, its territories or possessions, or Canada.*

*B. We Will Pay*

*We will pay all sums you legally must pay as damages because of bodily injury to your employees, provided the bodily injury is covered by this Employers Liability Insurance.*

*The damages we will pay, where recovery is permitted by law, include damages:*

1.  *For which you are liable to a third party by reason of a claim or suit against you by that third party to recover the damages claimed against such third party as a result of injury to your employee...*

*C. Exclusions*

*This insurance does not cover:*

1.  *Liability assumed under a contract.  This exclusion does not apply to a warranty that your work will be done in a workmanlike manner.*

**Discussion**

Capital claims that the evidence supports two factual scenarios that entitle it to coverage:  (1)

All-One was presented with a contract by Bertalon prior to starting its work and "executed" that contract by performing the work described therein, thereby entitling Capital to coverage under the CGL and Umbrella policies; or (2) no contract was in place between it and All-One, but All-One is entitled to indemnity and a defense against Capital's third-party claim under the Worker's Compensation and Umbrella policies, and Capital's damages would be paid from the proceeds of that policy.  The Court disagrees with Capital's position.

The first scenario proffered by Capital – that All-One received a written contract and executed it through performance – is simply unsupported by admissible evidence or sound contract interpretation.  Capital argues that the Rule 30(b)(6) deposition testimony of its Vice President, Brett Williams, supports the notion that a copy of the AIA standard subcontract was presented to All-One by Capital before or shortly after All-One began its work.  However, the only portions of his testimony that were not admittedly speculative and which even tangentially support such a proposition are (1) his testimony that it was the policy of Capital to issue standard AIA contracts to subcontractors at the start of the project, and (2) his hearsay testimony that a Capital office worker told him she was sure that an AIA form contract for subcontractors had been printed and issued for All-One.  Capital contends that this hearsay in Williams' testimony is  admissible because he provided it as a designated Rule 30(b)(6) deposition witness after investigating what happened within the company.

Despite Capital's unsupported argument to the contrary, hearsay is not admissible at trial just because it was provided by a witness speaking for the company at a Rule 30(b)(6) deposition.  Indeed, as the company's 30(b)(6) designee, Williams was required to speak on behalf of the

company at the deposition.  In doing so, he may have been required to provide a basis, whether founded on personal knowledge or hearsay, for the contentions or speculation he offered during the course of the deposition.  But that does not make his hearsay testimony admissible evidence, and a litigant's position at the summary judgment stage must be supported by admissible evidence.  A sister court in the Northern District of Ohio recently dealt with this issue and explained it well:

> First, the fact that a witness is a 30(b)(6) designee does not create a hearsay exception allowing him to simply repeat statements made by corporate officers and employees, if those statements are offered for their truth. As defendants pointed out, Rule 30(b)(6) does "permit  designated persons without personal knowledge to testify on behalf of a corporation on matters within the corporation's knowledge;" further, a corporate designee may testify about not only a corporation's knowledge but also its subjective beliefs.  These principles are designed to relieve burdens imposed on corporate defendants; however, they do not change the rule that a 30(b)(6) designee cannot "offer any testimony ... at trial ... to the extent that information was hearsay not falling within one of the authorized exceptions." ....

> Second, the rule that a 30(b)(6) designee cannot offer hearsay testimony holds especially true when there is no independent evidentiary basis that might otherwise prove the truth of the hearsay, such as corroborating testimony from the hearsay declarant.

*Cooley v. Lincoln Elec. Co.,* 693 F.Supp.2d 767, 791 (N.D. Ohio 2010)(footnoted citations omitted).

In the case at bar, all of the reliable admissible evidence substantiates the fact that All-One never received a written contract until after Gray's death.  All-One's project manager specifically testified that Capital's own project files contain no cover letter, first page, or copy of the subcontract other than copies printed subsequent to Gray's death.  Moreover, the record contains no affidavit from  Capital's project manager, Mark Bertalon, who is said to be the person who was going to deliver the contract to All-One.  Further, even Williams testified that Bertalon never told him that he had delivered the contract.  The Court does, however, have Bertalon's e-mail to Jeff Britton of All-

One on the day following Gray's death.  In that e-mail, Bertalon states that a formal contract would be forthcoming.  In the end, a fact-finder could not reasonably conclude that Capital provided All-One with a written contract prior to Gray's death.  This is an important conclusion. Without an executed contract in place prior to Gray's death, All-One is under no obligation to indemnify or insure Capital.  In addition, Capital is not entitled to coverage under the CGL policy issued to All-One by CIC.

Capital claims that All-One was required by contract to indemnify it.  However, there was no agreement in place at the time of Gray's death pertaining to indemnification.  In Indiana, one party may agree to indemnify another, but because indemnification provisions are generally disfavored, an agreement to indemnify must be stated in clear and unequivocal terms.  *Hagerman Const. Corp. v. Long Elec. Co.*, 741 N.E.2d 390, 392 (Ind. Ct. App. 2000).  Here, that did not occur.

From the evidence of record, it is quite clear that Capital accepted All-One's bid proposal and then asked it to begin work with the understanding that their contractual arrangement would be set forth in a written agreement that both would sign.  Unfortunately for Capital, its project manager never presented a written contract for All-One's review and execution until after Gray's accident occurred.  Prior to that agreement, there was no evidence of a meeting of the minds on any indemnity obligations between the two parties; thus, no recovery on the basis of contractual indemnification was available.  Jeff Britton's testimony is clear that different general contractors on different projects require different types of insurance from their subcontractors.  Simply stated, there was no agreement in place with regard to insurance or indemnity on this project until Britton signed the agreement after Gray's death.

14

Capital's search for coverage from CIC flowing from the CGL policy is equally unavailing. With regard to its claim that it is due coverage because of a contractual obligation on the part of All-One, there is an exclusion in both the CGL and Umbrella polices that applies. Both policies contain exclusions barring coverage for bodily injury that All-One is obligated to pay damages for as a result of its "*assumption of liability in a contract or agreement*." There are two exceptions limiting the application of these contractual liability exclusions and they are identical in both policies. These exceptions provide that the exclusions from coverage do not apply to liability for damages:

> *(1)    That the insured would have in the absence of the contract or agreement; or*
> *(2)    Assumed in a contract or agreement that is an "insured contract", provided that the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. . .*

Only the second exception is at issue here. CIC argues that even if there had been a contract in place, it would not have met the definition of an "insured contract" under the policy. While that argument is well founded, the Court need not reach that point in its analysis of the contractual liability exception because All-One could not have executed a contract it had yet to receive.[1] Under Indiana law, if the terms of an insurance policy are clear and unambiguous, they are to be given their plain and ordinary meaning. *Commercial Union Ins. v. Moore,* 663 N.E.2d 179, 180 (Ind. Ct. App. 1996). The clear meaning of "execution" with respect to a written contract covering the indemnity and insurance obligations of the parties is that it be signed. It is undisputed that the contract was not

---

[1]As CIC argues, the fact that there was no signed contract or meeting of the minds with regard to any indemnity obligations between Capital and All-One eliminates the existence of an "insured contract," because the definition of "insured contract" in the policy states that it is "that part of any other contract or agreement pertaining to your business ... under which you assume the tort liability of another," and the record does not support All-One's assumption of Capital's tort liability. This would also negate coverage pursuant to the Employer's Liability Exclusion.

signed by either Capital or All-One until after Gray's death.

Capital's next contention is that pursuant to the Contractors' CGL Broadened Endorsement, it became an insured under the policy.  However, in order to become an additional insured pursuant to that endorsement, All-One would have been required to add Capital as an insured in a written contract or, if acting pursuant to an oral agreement, a certificate of insurance needed to be issued. In this case, there was no written agreement executed prior to the occurrence and there was never an insurance certificate requested or issued before the deadly accident.  Consequently, Capital is not an additional insured.

That leaves Capital's second scenario as the only unresolved possibility for it to tap into All-One's insurance coverage.[2]  Capital claims that it is entitled to common law indemnity from

 All-One because Capital's potential liability to the Gray estate is purely derivative, and under Indiana common law, indemnity is recognized in favor of one whose liability is solely derivative. Therefore, Capital argues, because All-One would be liable under common law to indemnify Capital for its vicarious liability, the CIC Worker's Compensation Policy would kick in to pay damages, the recovery of which is "*permitted by law ... [f]or which you are liable to a third party by reason of a claim or suit against you by that third party to recover damages claimed against such third party as*

---

[2]Unlike its claim for coverage under the CGL policy, Capital is not seeking coverage as an additional insured under the Worker's Compensation Policy; rather, it seeks to recover from All-One on the basis that All-One owes Capital common law indemnity in connection with the Gray estate's claim.  Because CIC brought the action here seeking a declaratory judgment, it is appropriate for Capital to attempt to reach the insurance proceeds by standing in the shoes of All-
One and alleging that All-One is entitled to a defense and indemnity under the Worker's Compensation Policy with respect to Capital's third-party claim against it.

*a result of injury to your employee ....*"

In the state court action brought by the estate of Clinton Gray, a summary judgment has been entered in favor of the estate and against Capital on the issue of Capital's assumption, via contract with Kroger, of the nondelegable duty to provide for the safety of all employees on the construction project, including the employees of Capital's subcontractors.  In the order granting that summary judgment, the state trial court added the following:

> **IT IS FURTHER ORDERED,** that in addition to liability for its own negligence, the Defendant, Capital Construction Services, Inc., are (sic) vicariously liable for the negligence of its subcontractors including All One, Inc.

Capital cites this part of the order and the representation of the estate's attorney to the trial court, during the summary judgement hearing, that Capital is vicariously liable, as a basis for this Court to declare that All-One is entitled to indemnity under the Worker's Compensation Policy and a defense against Capital's third-party claim for common law indemnity.

Citing *Indianapolis Power & Light Co. v. Brad Snodgrass, Inc.,* 578 N.E.2d 669 (Ind. 1991), CIC responds that any judgment against Capital in the lawsuit brought by the estate necessarily constitutes a determination that Capital was not free from fault and therefore, not liable solely on the basis of vicarious basis.  The Court is not sure why the state trial court added this language to its summary judgment order regarding vicarious liability; nor does the Court know why the estate's attorney may have claimed that, despite the nondelegable duty assumed by Capital for safety, Capital was vicariously liable.  The Court, however, does know that the lawsuit brought by the estate does not name All-One as a defendant and that it does not allege that Capital is vicariously liable - only that it negligently breached its nondelegable duty owed to Clinton Gray.  The Court also knows from

17

the in-depth analysis of the Indiana Supreme Court in the *Indianapolis Power & Light* case that, where an injured employee sues a general contractor on the basis of its contractual assumption of a nondelegable safety duty on a construction project and does not allege vicarious or imputed liability, the contractor may not prevail on a claim of common law indemnity against the injured employee's employer because there must be a finding of fault attributable to the general contractor in order for it to be found liable. *Id.* at 672.

The trial court in *Indianapolis Power & Light* granted summary judgment on a third-party claim to Brad Snodgrass, Inc., a subcontractor on a renovation project whose employee had been injured on the job. The third-party claim was similar to the one here and was brought by the owner and general contractor who had been sued by the injured employee. *Id.* at 670. The Court of Appeals reversed the summary judgment, concluding that the Comparative Fault Act, which changed Indiana from a contributory fault state to a comparative fault state, had changed how vicarious liability would be applied in these situations. *Id.* On further appeal, the Indiana Supreme Court determined whether, due to a procedural anomaly prohibiting the assignment of fault to an injured employee's employer, the Indiana Comparative Fault Act had created a novel variation of vicarious fault that would apply in lawsuits brought by injured employees against non-employers, wherein the employer would be bound to indemnify the non-employer for that portion of fault that might be attributable to an injured employee's employer. *Id.* at 671-672. The Court opined that because the main objective of the Comparative Fault Act was not proportional allocation, but to modify the harsh and unfair effects of the contributory negligence rule on plaintiffs who are only slightly at fault, there was no implied change to the existing common law with regard to indemnity. *Id.* at 672-673. It then specifically warned of what might occur were it to find that some variation of common law indemnity applied in

this type of situation:

> We agree with Snodgrass that, if left undisturbed, the decision of the Court of Appeals on this point would result in a radical change in Indiana tort practice. In almost every work-related accident, the employer of the injured party would be joined as a third-party defendant in a common law implied indemnity claim even absent an express contractual indemnity agreement.

*Id*. at 673.

This is a very telling statement from Indiana's highest court, offering insight into how it would apply Indiana law in this situation, which is the Court's duty to discern. *Allstate Ins. Co. v. Menards, Inc.,* 285 F.3d 630, 635 (7th Cir. 2002)(district court sitting in diversity is bound to determine the content of state law as the highest court of the state would interpret it). All-One has already paid once for this accident through its statutorily mandated worker's compensation obligations. It cannot be made to pay again for any liability that might be found against Capital without an express contractual indemnity agreement, which does not exist. In short, there is no recovery to be had by Capital from All-One and, consequently, CIC has no obligation to defend or indemnify All-One in connection with Capital's third-party claim.

Accordingly, CIC owes no coverage or defense under any of its three policies and CIC's Motion For Summary Judgment [Dkt. 58] is GRANTED. Capital's Motion For Partial Summary Judgment [Dkt. 60] is DENIED. A separate judgment will enter forthwith.

IT IS SO ORDERED.

Dated: 9/1/2010

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution attached.

Distribution to:

John P. Daly Jr.
COHEN & MALAD LLP
jdaly@cohenandmalad.com

Mark S. Fryman Jr.
STARR AUSTEN MYERS & MILLER
fryman@starrausten.com

Bernie W. (Too) Keller
KELLER MACALUSO LLC
too@kellermacaluso.com

Jane Ellen Malloy
STEELE, ULMSCHNEIDER & MALLOY, LLP
malloy@sum-law.com

Scott L. Starr
STARR AUSTEN MYERS & MILLER LLP
starr@starrausten.com

M. Michael Stephenson
MCNEELY STEPHENSON THOPY & HARROLD
mmstephenson@msth.com

Andrew L. Teel
STEELE ULLMSCHNEIDER & MALLOY LLP
teel@sum-law.com